12602

RISH v. JACKSON *ET AL.*

(147 S. E., 324)

340

*Messrs. Williams, Croft & Busbee,* for appellant,

*Messrs. Gunter & Wilder,* for respondents,

February 22, 1929.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

This is an appeal from a decree of his Honor Judge Rice. For a proper understanding of the case, the decree of Judge Rice will be reported.

There are five exceptions.

Chief Justice Gary, in the case of *Hickson Lumber Co. v. Stallings,* 91 S. C., 473, 74 S. E., 1072, uses this language: "It was incumbent on the appellant, to satisfy this Court, by the preponderance of the evidence, that his Honor, the presiding Judge, erred in his findings of fact," which he has failed to do. Also *Leland v. Morrison,* 92 S. C., 510, 75 S. E., 889, Ann. Cas., 1914-B, 349; *Simmons v. Pender,* 124 S. C., 506, 117 S. E., 731; *Amick v. Wessinger,* 125 S. C., 68, 118 S. E., 32; *Boozer v. Gunter,* 127 S. C., 141, 120 S. E., 749.

There is ample testimony to support the decree of Judge Rice.

All of the exceptions are overruled and judgment affirmed.

MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : There are several circumstances in this case that lead me to the conclusion that the defendant has not sustained the burden of proof that was upon him to establish the fact of part payment of the note which he asserts:

(1) The note is dated November 21, 1924, and is made payable *November 21, 1925,* with interest *after maturity* at 8 per cent. ; the payment of $800, claimed to have been made by the defendant, is evidenced by a receipt dated *January 31, 1925,* a few days more than two months after the note, *with interest prepaid,* and with practically ten months to run before it could be enforced, had been executed. There are no circumstances indicated in the evidence to the effect that Mrs. Garvin was at that time pressed for money or that she had made any demand or request that Jackson anticipate the payment of any part of the note.

The testimony is incredible that Jackson's treasury had become so inflated between November, 1924, and January, 1925, as to induce him to make such a substantial payment upon the note and lose the interest from January, 1925, to November, 1925, when the note fell due, amounting to

$100. People do not do business that way; the evidence that the defendant in this case did so should be clear and convincing and supported by the attending circumstances. It cannot be suggested that Jackson was under the impression that the note was payable one day after date, for the receipt specifically referred to it as being due in the following November. How he was in a position financially, or why he was induced, to anticipate the payment of more than 50 per cent. of the principal, ten months before it was due, has not been explained.

(2) On December 27, 1924, about a month after the note was given to her, Mrs. Garvin borrowed $400 from the bank, and pledged the Jackson note and mortgage as security; that note has never been paid, and is still an outstanding liability df Mrs. Garvin's estate. The Court is expected to believe that this manifestly plain and simple-hearted old lady, with whom generally bank notes are nightmares, within less than a month from the time she made the bank note, received in cash twice the amount of the note and allowed it to stand open. It is significant that the bank note for $400 was made payable on November 21, 1925, the day of the maturity of the Jackson note, out of which evidently she expected to pay the bank note.

(3) Although it was testified to by witnesses for the defendant that they saw Jackson pay Mrs. Garvin the $800 in cash at the home of Jackson, it appears that she rode with the defendant thereafter to the home of Mrs. Whittle, a daughter. No one appears to testify that she had at that time on her person so large a sum of money. On the contrary, it appears that, while there, she was called upon to pay the road tax of a laborer, and in her handbag there was only $1.50.

The bank books show no deposit of such an amount; not a single witness testified that they had seen her in possession of so large a sum of money; and none was found in her possession at the time of her death, which occurred less than

three weeks thereafter. At the time of her death her deposit account in the bank showed a credit balance of only $62.

(4) The administrator testified that at the house where the funeral of the old lady was being conducted the defendant was in ill humor and said: "I haven't got a damned thing to do with it (the funeral). *I want one thing, I want to pay that $1,500 I owe her,* and she can go to hell," and several witnesses testified to Jackson's statement of the debt at $1,-500.

(5) The most convincing evidence against the contention of the defendant in reference to the alleged payment of the $800 is the testimony of the Probate Judge to the effect that, after Rish had made a written application or petition for appointment as administrator of the estate of Mrs. Garvin, the defendant, Jackson, appeared in his office and entered *objection to the appointment;* that he read over the application to Jackson in which the note and mortgage were referred to as being for $1,500; that Jackson objected to the appointment of Rish, but made no objection to the statement as to the amount of the note and mortgage due by him to Mrs. Garvin.

It is incredible that Jackson would have listened to the reading of the application which stated the amount of the note and mortgage at $1,500, in September, 1925, when he had in his hands a receipt given in January, 1925, for more than half of it.

It appears that Mrs. Garvin had made a will dated in August, 1924, and that, later, having sold certain land covered by the will to Jackson, she made a new will dated January 30, 1925, the day before the alleged $800 receipt was dated, conforming to the changed situation, but, having changed the situation again, according to Jackson's contention, she made no further change, although the changed situation would have rendered it impossible to carry out the last will.

Both daughters of Mrs. Garvin with whom she visited immediately after the alleged transaction in the home of Jackson, and at one of whose houses she died, testified that their mother at the time of her death had in her handbag 50 cents.

It is an unaccountable circumstance that no one appears to have known who the scribe was that wrote out the alleged receipt and that the circumstances of its preparation are shrouded in mystery. The story is incredible that this old lady, who had no immediate demand upon her for money, should have importuned Jackson to anticipate his note, should have had prepared in advance a receipt for $800, and carried it with her to Jackson's home.

The most inexplicable circumstance connected with the alleged transaction is what became of the $800 in cash claimed by the defendant to have been paid to Mrs. Garvin. He fixes the date of the payment as of Thursday, February 5, 1925; he states that she spent Thursday night at his house, after the payment had been made; that he carried her the next day to the home of one of her daughters. It appears that she went from there to the home of another daughter, where she died a few days thereafter. The $800 appears to have disappeared like the victim of a German U-boat "without a trace," without even a bubble. No one at Jackson's home gives any account of it; no one at the home of either daughter; no deposit of the cash at the bank; not a trace of it anywhere by any one. It is inconceivable that she lost it without some one bearing witness to the natural disturbance which such an event would have caused. Luke XV, 8.